W. J. STEWART, APPELLEE, V. GEORGE A. STEWART ET AL., APPELLEES, AND THE GERMAN NATIONAL BANK OF HASTINGS, APPELLANT.

FILED MARCH 29, 1893. No. 4638.

Voluntary Assignments: CHATTEL MORTGAGES: FRAUD. Where a chattel mortgage was made and taken by a creditor of the mortgagor upon all his property, its purpose being not only to secure a debt due the mortgagee, but also to secure other creditors of the mortgagor not named therein, whose rights are not expressly reserved from the operation of the assignment law of this state, such mortgage is *held* void as an irregular, prohibited voluntary assignment.

APPEAL from the district court of Adams county. Heard below before GASLIN, J.

*Batty, Casto & Dungan*, for appellant.

*Capps, McCreary & Stevens, Tibbets, Morey & Ferris, Hewett & Olmstead, M. A. & J. C. Hartigan, Bedford Brown, J. B. Cessna,* and *W. P. McCreary, contra.*

RYAN, C.

On January 8, 1890, George A. Stewart executed upon his stock of furniture three several chattel mortgages, one to the German National Bank of Hastings, Nebraska, to secure the payment of $4,964.44; one to John R. Stewart, his brother, to secure payment of $2,150, the third to his father, W. J. Stewart, to secure the payment of $4,930, which several mortgages were the same afternoon duly presented for record by the same person, who, to emphasize the order of priority recited as coincident with above enumeration, and the recitals in the mortgages themselves of the priority of each, caused them to be filed by the county clerk with slight intervals between, in the order named. On the same day there was filed by W. J. Stewart his petition to foreclose said mortgage in his favor in the district court of Adams county, Nebraska, against George A. Stewart, the German National Bank of Hastings, and John R. Stewart. This petition recited that said mortgages were liens in the order of above enumeration, but that said mortgagees having gone into possession at one and the same time, each with the other, there was no priority of possession as between them, and furthermore the plaintiff made known that if either defendant mortgagee should obtain sole possession that such possession would be so used as to cause a sacrifice of the mortgaged property and render worthless the mortgage to the plaintiff. This petition further averred that George A. Stewart was wholly insolvent.

To this petition the defendants filed a written appearance by themselves or attorney on January 8, 1890. On the same day there was given defendants notice of an ap-

plication for a receiver to be presented to Hon. Wm. Gaslin at 6 o'clock P. M. of said day, by whom at said time a receiver of the mortgaged property was on said petition and due proofs appointed. As between the above named parties issue was duly joined by answers praying the fore-closure of the mortgage of each mortgagee above named.

In due time some twenty-seven different parties, claiming to be creditors of George A. Stewart, intervened in the action, and by pertinent pleadings challenged the *bona fides* and validity of said several mortgages. On the final hearing of the case the contention of the said intervenors was sustained, and the rights of said mortgagees to the proceeds of the sale of the mortgaged property in the hands of the receiver—said property meantime having been sold under order of said court—were decreed inferior to those of Stewart's unsecured creditors. The net proceeds of this sale do not equal the sum secured by the mortgage to the German National Bank, hence the controversy is narrowed down to a contest between the unsecured creditors of George A. Stewart and said bank as to the *bona fides* and validity of said mortgage.

The evidence shows that on January 8, 1890, there was due from George A. Stewart to Sandford Idell, one of his clerks, $95; to Frank Leonard, another clerk, about $764.60. Mr. Dietrich, president of said bank, testified that at said date he was getting uneasy as to the claim due from G. A. Stewart to the bank, and asked Stewart to give security, which Stewart agreed to, but wanted Leonard paid; that witness took his note for that amount and told the clerk to place it to Leonard's credit. The same was done as to Idell. Stewart said he owed Mr. Batty $400, which with an overdraft of $147.14, made up one note. These three items of $95, $764.60, and $547.14 were included in the mortgage to said bank. The trial of this cause was on September 18, 1890, and the president of said bank then testified that about six weeks before that time

witness had said to Mr. Leonard, in substance, that the bank had been forced to advance this money to Stewart to get him to give security. "Now," said he, "if you are willing to share the loss with us, as we are coming out short, we would like it." That Leonard said he would do what was fair, and he made his proposition and it was accepted. "He came," said the witness, "at my request to the bank after the receiver had made his report." W. H. Fuller, cashier of the German National Bank, testified that this $764.60 was placed to the credit of Mr. Leonard on December 12, 1890, and that on the 12th of the same month Mr. Leonard drew out $60. On July 31st he turned over to the bank $354.60, then on September 5 1890, he came in and said he had turned over to the bank more than he intended to by $40, and asked that the bank give him credit for $40, which was done. As to the claim of Mr. Idell, this witness testified that the amount due him ($95) was placed to his credit with the bank December 12, 1889; that on July 31, 1890, Idell took from the bank $50 and paid back the balance to the bank. He indorsed the certificate of deposit for $95. The bank had that certificate. Each amount retained from Leonard and Idell respectively was placed to the interest account of the bank. W. A. Dilworth testified that in June or July, 1890, he went to the bank on behalf of Mr. Idell; that the cashier, Mr. Fuller, said the money was secured in a mortgage from Stewart to the bank and would be paid as soon as the money was realized under the mortgage. Mr. Idell himself testified that he was never told that the $95 was deposited to his credit; neither did he know it was there to pay his account against Stewart. He was told at the bank that he would be paid when the goods were sold. He said, "I called at the bank after last court was over and Fuller offered me $50—did not tell me any money was there for me, and as I had waited so long I concluded to take $50. He said the matter was in litiga-

39

tion, and that the bank was coming out short and my account could not be paid in full."

In relation to his claim, Mr. Leonard testified that he was never told that it was deposited subject to his order; that he went into the bank to borrow $60, and asked the cashier first and was referred to the president, who said witness could have it. Witness offered to give security on a horse and buggy and anything else witness had. The president of the bank said to witness that he need give no security, just give his check for $60, which was done, and that amount was paid witness thereon. This witness said that the president of the bank told witness to hold on and he would secure him his money. After the goods had been sold the bank officers told witness sufficient money to pay witness was not there and that witness would have to lose it; afterward, being sent for, witness went to the bank and Mr. Fuller offered witness $350 for his claim; the president, upon his refusal to accept the above, offered $400; finally, being refused as to less, the president offered $450, and the witness, rather than take nothing, accepted that offer. Mr. Dietrich, the president of the bank, told this witness that possibly witness would get nothing out of the security taken by the bank. Mr. Dietrich informed this witness that his claim was secured in the mortgage shortly after the failure. Mr. Dietrich, being recalled, said that soon after Stewart had given the various notes witness told Mr. Leonard his account was taken care of.

As to the amount due Mr. Batty, there is no question made that the note of $547.14 secured by the mortgage to the bank was to cover $400 to be paid to Mr. Batty, and the balance was to take up an overdraft of Mr. Stewart due the bank. If this last was the only matter for consideration there would be no difficulty in upholding the mortgage to the bank. Unfortunately, the Idell and the Leonard matters present greater obstacles, for while the cashier and president would have it believed that this

mortgage was taken to secure money actually advanced by the bank for and devoted to the payment of these claims, the clear preponderance of the evidence is against them. Without doubt the mortgage was given and taken to secure not only debts due to the bank, but it was executed to secure the claims of Idell and Leonard. Had this been done by a mortgage to each party beneficially interested, the same questions need not have arisen as to the validity of the mortgage to the bank. But this was not done. The bank, as trustee for Idell and Leonard, received the mortgage in part to secure these two claims. There can be no question, upon the evidence, that the mortgage to the German National Bank covered all the property of George A. Stewart to which his creditors could resort for the payment of the several debts due them.

Commenting upon a similar state of facts in *Bonns v. Carter*, 22 Neb., 518, MAXWELL, J., said: " If a debtor is unable to pay his debts in full, it certainly is but justice that each creditor should be paid a fair proportion of the entire assets of such debtor. Any other rule carries upon its face the stamp of unfairness, and should as far as possible be discouraged. The general assignment law of the state prohibits preferences, except in certain trifling matters, and but for the first section of that act no doubt would control in this case. A debtor who by any instrument transfers all his property to one or more creditors or other persons for their benefit has in fact *assigned it*. So far as his right, control, and possession of the property are concerned they have passed to others and are not to be returned to the debtor until the purposes of the trust are accomplished; and then only the residue of the property is to be returned. No refinement of definition can make such a transfer essentially different from an assignment."

Obviously this language is applicable to the facts clearly established by the testimony in this case, and the mortgage in question, having been made, and taken upon all of the

mortgagor's property in secret trust for Idell and Leonard as well as to secure the bank's claim, was in contravention of the provisions of the assignment law of this state. It therefore follows that the judgment of the district court must be

AFFIRMED.

IRVINE C., concurs.

RAGAN C., having been of counsel, took no part in the consideration or determination of this case.